The Barnebey-Cheney Engineering Company v. Commissioner. Barnebey-Cheney Company v. Commissioner.
Barnebey-Cheney Engineering Co. v. Commissioner
Docket Nos. 27301, 47642.
United States Tax Court
T.C. Memo 1954-104; 1954 Tax Ct. Memo LEXIS 144; 13 T.C.M. (CCH) 683; T.C.M. (RIA) 54210; July 23, 1954, Filed *144 1. Respondent's treatment of accrued salaries, royalties, and expenses credited by petitioner to the account of its president and majority stockholder sustained in part and reversed in part. 2. Held: Petitioner is entitled to deduct, in 1943 and 1944, the unrecovered costs of certain plant equipment as losses sustained in that year by reason of abandonment or as reasonable allowances for obsolescence. Roger K. Powell, Esq., for the petitioners. William R. Bagby, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion Respondent determined deficiencies in income and excess profits taxes of the petitioner for the calendar years 1941, 1942, 1947, 1948, and 1949, as follows: Year
Income Tax
Excess Profits Tax
1941
$ 50,416.70
1942
$ 5,645.65
164,757.51
1947
48,080.87
1948
12,772.23
1949
2,671.88 Petitioner claims overassessments for the calendar years 1941 and 1942 resulting from claimed loss carry-backs from 1943 and 1944. Certain of the issues raised by the pleadings have been conceded by petitioner. There remain for our consideration and disposition: *146 1. Whether petitioner may properly deduct accrued salaries, royalties, and expenses credited to the account of its president who was owner of more than one-half the outstanding stock and who reported on the cash basis for the years 1941 to 1944, inclusive, and for the years 1948 and 1949, and which accruals were not paid within two and one-half months of each of the years involved; 2. Whether petitioner is entitled to deduct in 1943 and 1944 the unrecovered cost of depreciable assets, the useful value of which is claimed to have been lost during those years. Findings of Fact Those facts which have been stipulated are so found and included herein by this reference. The petitioner is The Barnebey-Cheney Engineering Company, an Ohio corporation with its principal office in Columbus, Ohio. Prior to the hearing, its name was changed to the Barnebey-Cheney Company. Petitioner kept its books and made its returns on the accrual basis of accounting for the taxable years here involved. The returns were filed with the collector of internal revenue for the eleventh district of Ohio at Columbus. The petitioner is, and was during the taxable years, engaged in the manufacture of activated *147 charcoal, which is used to filter gases from the air. This charcoal has little use except for specialized engineering projects in specific industries and for military use in gas masks. Petitioner operates under patents of O. L. Barnebey and is one of three producers of activated charcoal in the United States. Activated charcoal is made from organic material, principally shells, coal or similar substances. The best type of material for the production of activated charcoal of all types so far discovered is cocoanut shell. At times when adequate supplies of cocoanut shells were not available, substitutes were sought among black walnut shells, peach pits, coquito and other substances. Between 1919 and 1940 the principal use of activated charcoal was in connection with the recovery of solvents. Fumes containing solvents were passed through large beds of activated charcoal which retained the solvent and passed the solvent-free air through. The solvent thus retained was reclaimed by heat or similar process. Such installations were bulky and expensive and their use was limited to a relatively small number of plants in which the value of the solvent recoverable justified extensive investment *148 in recovery equipment. Another very minor use was in connection with the testing for the gasoline content of natural gas. During the years 1938, 1939 and 1940 petitioner sold to approximately 35 customers in each year. Its total sales during 1938 amounted to 61,259 pounds, including 8,000 pounds revivified charcoal, the largest single purchaser being the Chemical Warfare Service, which purchased 30,300 pounds. Total sales in dollars were $23,593.82, of which $16,232.43 was for civilian industrial use. Total sales in 1939 were 70,095 pounds, including 28,280 pounds revivified charcoal, the largest single customer being the Chemical Warfare Service, which purchased 29,310 pounds. Total sales in dollars were $45,499.91. Total sales during 1940 were 81,872 pounds, the largest single customer being the Wah Chang Trading Corporation, which purchased 40,000 pounds. Total sales in dollars were $45,453.70. In 1940 the Chemical Warfare Service of the United States Army projected a program for the production and distribution of gas masks which was to utilize large quantities of activated charcoal for the purpose of filtering poisonous gases from the atmosphere. Principally because of the *149 previous wartime experience of Barnebey, the president of petitioner, and also as one of only three producers of activated charcoal in the United States, petitioner was requested to and did enter actively into this gas mask charcoal program and spent large sums of money in the purchase of raw materials and in planning and acquiring extensive facilities for experiment and production of charcoal for this purpose. During the years 1941 through 1944 no industrial installations were made by petitioner's associated company, American Solvents Recovery Corporation, which furnished the principal market for petitioner's product for civilian use. No civilian installations were made in the United States during such period and only a few military installations were made for industrial purposes, in connection with the recovery of solvents. The only other military use was in the gas mask charcoal program. During the years 1941 through 1944 petitioner made no sales of activated charcoal to civilian users except for testing purposes and made no sales for any military purpose other than gas mask use. The gas mask charcoal program, as it concerned the petitioner's operation, was divided into three *150 phases: first, experimental production of charcoal by new and untried processes or by possible improvements upon existing processes; second, the construction of extensive physical facilities for the manufacture of activated charcoal, including the acquisition of large quantities of domestic products suitable to the manufacture of such charcoal and the construction of facilities for carbonizing the same prior to activation; and, third, the actual production of activated charcoal and its treatment for specialized uses by the Chemical Warfare Service. Commencing in 1940, substantial experimental work was done pursuant to the program outlined. In connection therewith petitioner remodeled old furnaces having a capacity of one ton each of an aggregate cost of $20,000, of which amount $10,000 was amortized by December 31, 1943. The foregoing was done, along with the acquisition of other items, under a certificate of necessity, and such equipment was amortized over a period of 60 months from the date of acquisition throughout the taxable years in controversy. Petitioner also expended sums, in connection with such experimental work, upon the remodeling of its building and the acquisition of *151 furnaces and equipment which had an aggregate remaining cost on December 31, 1943, of $45,812.93. The experimental work was completely abandoned by petitioner prior to the end of 1943. During 1940, 1941, and 1942, petitioner expended money in erecting and acquiring a plant and equipment for the production of gas mask charcoal. Among other things, it acquired, both with and without certificates of necessity, carbonizers and carbonizer furnaces, baking equipment, screen and grinding equipment, laboratory facilities, activating and other furnaces, extruders, women's washroom, ammonia storage and other miscellaneous equipment, all of which was designed solely for use in connection with the plant for the production of activated charcoal for gas mask purposes. The unrecovered cost of these items on December 31, 1944 was $200,078.88. [1]
Petitioner also constructed a carbonizer at Stockton, California, in 1943 at a cost of $27,603.85. This carbonizer cracked during the preheating period in 1943 and was neither used nor usable thereafter. *152 It was valueless on December 31, 1943. This machinery and equipment was adapted only to the manufacture of activated charcoal and had no other utility. The pre-war use of activated charcoal had been negligible and whatever civilian market the petitioner had had was nonexistent in 1943 and 1944. No part of the cost of the foregoing furnaces and carbonizers was deducted as loss due to abandonment or loss of useful value on petitioner's 1944 income tax returns. The production records of the petitioner indicate that the last run on furnace No. 1 occurred on November 13, 1942; that the last production run on furnace No. 2 occurred on January 9, 1943, although such furnace was in use as late as April 15, 1944; that the last production run on furance No. 3 occurred on August 25, 1943, although such furnace was in use as late as March 9, 1944; and that the last production run on furnace No. 4 occurred on January 8, 1943. Petitioner's production records also indicate that the last production run on furnaces No. 6 through 9 occurred in the year 1944. Petitioner's records do not indicate that furnace No. 10 was ever used. Petitioner's Columbus furnace was substantially demolished and removed *153 prior to 1949 and the unrecovered cost of petitioner's Waxahachie carbonizer was charged off in petitioner's 1947 income tax return. There was an ascertainment by the Chemical Warfare Service by the end of 1942 that petitioner was unable to compete with Pittsburgh Coal and Iron Company (hereinafter called Pittsburgh) in the production of gas mask charcoal, either on the basis of meeting specifications, certainty of production, or the cost of the finished material. After keeping petitioner in production throughout 1943 at the lowest rate which could be set without very serious financial difficulties for petitioner, all production contracts of petitioner were canceled and teminated by the Armed Services in 1944, and petitioner thereafter received no further production contracts. A final contract for charcoal in process at the date of termination was entered into which was completed from charcoal on hand prior to December 31, 1944. Throughout 1944, petitioner had hopes based upon assurances from some of the officers in the Chemical Warfare Service of receiving further production contracts. Early in 1944, petitioner's whetlerizing facilities at its Zanesville plant were seized and turned *154 over to Pittsburgh. Such facilities were returned to petitioner sometime in 1945. O. L. Barnebey is the president of petitioner and was the owner, directly or indirectly, of more than 50 per cent of its stock throughout the years 1940 to 1950. The company maintained a running account of amounts due Barnebey and payments made to him on account thereof. The debits to such account consisted of a salary of $300 per month, royalties based upon production under certain patents and processes owned by Barnebey, and amounts expended by Barnebey on behalf of the corporation for traveling and other expenses, constituting advancements to the corporation to be repaid by it. An accrued balance was due Barnebey on December 31, 1940, of $14,665.99. During the year 1941 the petitioner accrued as expenses the following items payable to Barnebey: Salary
$ 3,600.00
Royalties
107,134.83
Expenses
2,818.13
Total
$113,552.96 Payment of $3,900 was made by petitioner to Barnebey between January 1, 1941 [2] and March 15, 1941. Total payments of $24,117.01 were made to him by petitioner between March 15, 1941 and December 31, 1941. Additional payments aggregating $37,750 were made to Barnebey *155 between January 1, 1942, and March 15, 1942. In 1942 petitioner accrued as payable to Barnebey a total of $137,457.97. Petitioner paid him the sum of $113,061.71 between March 15, 1942 and December 31, 1942, and an additional sum of $42,551.20 between January 1, 1943 and March 15, 1943. In 1943 petitioner accrued the sum of $24,843.52 upon its books as payable to Barnebey. Petitioner paid $16,539.46 to him between March 15, 1943 and December 31, 1943, and the further sum of $500 between January 1, 1944 and March 15, 1944. In 1944 petitioner accrued the sum of $19,365.50 and paid $22,007.85 between March 15, 1944 and December 31, 1944, and the further sum of $2,025.40 between January 1, 1945 and March 15, 1945. Respondent disallowed as unpaid expenses accrued to Barnebey in the calendar year 1943 the total sum of $15,436.15, as remaining unpaid on March 15, 1944, of which $4,659.60 was business expense of petitioner advanced by Barnebey for the benefit of petitioner during the year 1943. Respondent disallowed as unpaid expenses accrued to Barnebey in the calendar year 1944 the total sum of $19,365.50 *156 as remaining unpaid on March 15, 1945, of which $3,660.45 was business expense of petitioner advanced by Barnebey for the benefit of petitioner during the year 1944. The foregoing amounts accrued to the account of Barnebey for the years 1942 through 1944 consisted of salaries, royalties and expenses as follows: Traveling
Total
Year
Expenses
Salary
Royalties
Accrued
1942
$7,417.15
$3,600
$126,455.82
$137,472.97
1943
4,659.60
3,600
7,176.55
15,436.15
1944
3,660.45
3,600
12,135.05
19,365.50
During the years 1945 to 1949, inclusive, the petitioner accrued in its books and records in the individual account of Barnebey the following: Traveling
Total
Year
Expenses
Salary
Royalties
Accrued
1945
$3,033.20
$3,600.00
$ 0.
$6,633.20
1946
1,828.50
3,600.00
0.
5,428.50
1947
0.
3,238.80
0.
3,238.80
1948
3,774.25
3,600.00
0.
7,374.25
1949
3,000.14
3,600.00
0.
6,600.14
As of December 31, 1949, the petitioner still owed O. L. Barnebey the amount of $90,858.83 on all of the above mentioned accruals. Petitioner had in its possession as of December 31, 1941, cash of $70,351.05; as of *157 March 15, 1942, cash of $73,613.29; as of December 31, 1943, cash of $2,634.62; as of December 31, 1944, cash of $22,474.45; and as of December 31, 1945, cash of $2,708.04. At December 31, 1946, the taxpayer's cash was $1,694.97. The calendar year return of Barnebey for the taxable year 1940 was filed on the cash basis. His calendar year returns for 1941 and 1942 did not indicate or designate on which basis, cash or accrual, they were filed. When the 1941 return was audited by a revenue agent, a deduction claimed for delinquent property tax paid during that year was allowed. Barnebey's income tax returns and the revenue agent's reports of examination thereof for the years 1942, 1943, and 1944, show that a salary of $3,600 was paid to him by petitioner in such years. The 1943 calendar year return of Barnebey bore the statement "on the accrual basis," but Barnebey had, at no time, requested the respondent's permission to change from the cash to the accrual basis for reporting his income and no such permission had been granted. Such returns for the years 1944 to 1949, inclusive, bore no designation or indication as to whether they were filed on the cash or accrual basis. The research *158 and experimental program in connection with which petitioner had invested in furnaces and equipment was abandoned in 1943. At that date, the unrecovered cost of such facilities amounted to $45,812.93. This figure, less an estimated salvage value of 10 per cent, represented the amount of petitioner's loss, the deduction of which is allowable in 1943. It was stipulated that the Stockton carbonizer, built in 1943 at a cost of $27,607.85, was cracked during preheating and was neither used nor usable thereafter. The total amount invested represented a loss in 1943 and is allowable in full. The unrecovered cost of other facilities installed by petitioner as of December 31, 1944, amounted to $200,078.88. Ten per cent is a reasonable approximation of salvage value. The unrecovered cost, less 10 per cent, is allowable as loss incurred in 1943 and 1944. The resultant figure is apportioned two-fifths to 1943 and three-fifths to 1944. Opinion VAN FOSSAN, Judge: The first question involves the propriety of respondent's treatment of certain accrued salaries, royalties, and traveling expenses credited by petitioner to Barnebey's account during the years involved. As authority for his action, *159 respondent invokes section 24(c) of the Internal Revenue Code. [3] For the statute to be applicable, all three of the conditions listed must coexist. Fincher Motors, Inc., 43 B.T.A. 673; Michael Flynn Manufacturing Co., 3 T.C. 932. Here the *160 parties are in accord as to the existence of two of the required conditions. That is to say, there is no dispute that Barnebey, the creditor, was on the cash basis, and, as president and holder of more than 50 per cent of the stock of petitioner, the debtor, occupied a special relationship thereto. The parties, however, disagree as to the presence of the third prerequisite, i.e., whether or not payment was made on the accruals within the time allowed. This question turns on the determination of the proper method of applying payments to the accruals theretofore made. There is no question that the payments were actually made. Prior to and during the years involved, petitioner maintained on its books an open running account for Barnebey wherein all items payable to him were accrued and all payments made to him were credited. No distinction was made therein as between various items of salary, expense reimbursement, and royalties due him. Neither was there any identification nor specific application therein of the payments to such charges. Between March 15 of each year involved and March 15 of the respective succeeding year, petitioner made payments to Barnebey, which payments in some *161 years exceeded the aggregate of current accruals. Nevertheless, at the close of each year, there remained a debit balance in the account due Barnebey. In arriving at his determination, respondent has applied all payments made by petitioner to Barnebey first to the retirement of such outstanding balance. Respondent's action is in line with the well known general rule of common law that payment on an account unidentified as applicable to any specific charges is deemed to have been applied in extinguishment of the earliest items of debt in order of time in which they stand in the account, and will be so applied until exhausted. Although recognizing this common law concept, petitioner urges that it is inapplicable to the present situation. Instead, petitioner maintains that under circumstances such as those before us, the payments in dispute should in all fairness be construed as satisfying the current accrual. A similar contention was considered and rejected by us in Lincoln Storage Warehouses, 13 T.C. 33, affd. 189 Fed. (2d) 337, the rationale of which appears controlling here. See also The Union National Bank v. The City of Cleveland, 10 Ohio Cir. Ct. 222. *162 Beckel v. Petticrew, 6 O.S. 247. Therefore, except in so far as the facts show specific appropriation of some portion of such payments to current accruals, respondent's action was justified. The record clearly indicates that $3,600 of the aggregate annual payments in 1943 and 1944 was meant to apply against the current accrual of Barnebey's salary and was in fact so applied. As to this item, respondent is reversed. Respondent also disallowed the deduction of certain other items which were accrued in 1943 and 1944 as owing to Barnebey and which consisted wholly of advances by him to petitioner in payment of certain business expenses of petitioner. Obviously such expenses having been incurred by petitioner would be deductible by it whether or not Barnebey was ever repaid for advancing the amounts thereof. This being true, the accruals in question would not properly come within the scope and intendment of the statute invoked. Respondent's disallowance thereof was error. The remaining items in issue consist of royalties. In the computation under Rule 50 consequent thereon, the royalties will be tested under the rule laid down in the above cited cases. To the extent that the payments *163 come within the rule, the respondent is sustained. The next question is whether petitioner may deduct in 1943 and 1944 the unrecovered cost of certain depreciable assets, the useful value of which it claims was lost during those years. Respondent has conceded such loss with respect to some of the assets to which petitioner adverts. His concessions are contained in the stipulation filed herein and will be reflected in the Rule 50 computation consequent hereon. It is petitioner's position, with respect to those items remaining in controversy, that the unrecovered costs thereof are deductible in 1943 and 1944, respectively, under section 23(f) of the Code, as losses sustained during those years by reason of abandonment as well as under section 23(1) as reasonable allowances for obsolescence. The record in this case is such a conglomerate or aggregate of facts and figures that of necessity certain arbitrary judgments will have to take the place of logic. Whether these deductions from income be allowed as due to abandonment or to obsolescence, makes no difference in the end result. Petitioner had made the investment in facilities for research and production under war conditions and *164 war contracts. With the change in emphasis of the war effort and the suspension or cancellation of all of petitioner's contracts, petitioner was left with a large investment in facilities useful in war production but practically valueless for any other use. The unrecovered cost of such investment, less salvage, if any, was a loss to petitioner, characterize it how you may. The courts have long recognized such losses as proper deductions from income in the investor's accounting. We are thoroughly satisfied with the fact of such loss and the deductibility of some amount in consequence. In the determination of such loss any figure is at best an approximation based on the best information available. In our findings we have set out the amounts allowable as deductions. Nothing would be contributed by an extended discussion. The figures found represent our best judgment of the allowable amounts. Decisions will be entered under Rule 50. Footnotes
1. There appears to be an unexplained discrepancy of $1.04 between the total of unrecovered costs as per the stipulation and as per the testimony.↩
2. The stipulation here reads "July 1, 1941," which is obviously in error.↩
3. SEC. 24. ITEMS NOT DEDUCTIBLE. * * *
(c) Unpaid Expenses and Interest. - In computing net income no deduction shall be allowed under section 23(a), relating to expenses incurred, or under section 23(b), relating to interest accrued - (1) If such expenses or interest are not paid within the taxable year or within two and one-half months after the close thereof; and (2) If, by reason of the method of accounting of the person to whom the payment is to be made, the amount thereof is not, unless paid, includible in the gross income of such person for the taxable year in which or with which the taxable year of the taxpayer ends; and (3) If, at the close of the taxable year of the taxpayer or at any time within two and one-half months thereafter, both the taxpayer and the person to whom the payment is to be made are persons between whom losses would be disallowed under section 24(b)↩.